# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOHNNY R. HERRON,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:13cv00001 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Johnny R. Herron, ("Herron"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Herron filed his applications for SSI and DIB[2] on March 31, 2009, alleging disability as of April 30, 2008, due to problems with his lungs, back, vision, knees and shoulders. (Record, ("R."), at 203-04, 207-09, 221.) The claims were denied initially and upon reconsideration. (R. at 106-08, 112-14, 118-20, 122-31.) Herron then requested a hearing before an administrative law judge, ("ALJ"). (R. at 132.) A hearing was held on February 17, 2012, at which Herron was represented by counsel. (R. at 28-56.)

By decision dated February 23, 2012, the ALJ denied Herron's claims. (R. at 15-26.) The ALJ found that Herron met the disability insured status requirements of the Act for DIB purposes through March 31, 2010. (R. at 17.) The ALJ found that Herron had not engaged in substantial gainful activity since April 30, 2008, the alleged onset date. (R. at 17.) The ALJ found that the medical evidence established that Herron had severe impairments, namely chronic obstructive pulmonary disease, ("COPD"), degenerative changes of the lumbar spine, right shoulder separation, cerebral and cerebellar atrophy, personality disorder, depression, borderline intellectual functioning and alcohol dependence, but the ALJ found that Herron did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ found that Herron

---

[2] Herron filed a prior claim for DIB, which was denied in August 2008,. (R. at 217.)

had the residual functional capacity to perform simple, routine, repetitive, low stress light work,[3] with the ability to lift and carry items weighing up to 40 pounds occasionally and 20 pounds frequently, that required no more than occasional bending or reaching above the head and that did not require him to crawl or work around unprotected heights. (R. at 20.) The ALJ found that Herron was unable to perform any of his past relevant work. (R. at 24.) Based on Herron's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Herron could perform, including jobs as an arcade attendant, a parking lot attendant and a plastics assembler. (R. at 25.) Thus, the ALJ concluded that Herron was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2013).

After the ALJ issued his decision, Herron pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 1-4.) Herron then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2013). This case is before this court on Herron's motion for summary judgment filed July 23, 2013, and the Commissioner's motion for summary judgment filed August 26, 2013.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2013).

## II. Facts

Herron was born in 1960, (R. at 203, 207, 216), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). Herron has a ninth-grade education and past work experience as a dishwasher. (R. at 35, 38, 225, 265.) Herron testified that he consumed "[a] beer every once in a while" to help with his shoulder pain. (R. at 43.) He stated that he consumed about a quart of beer twice a week. (R. at 43.) Herron stated that he walked three miles a day because he had "nothing else to do." (R. at 43-44.) He stated that it helped him to walk. (R. at 44.) Herron stated that he did not have a driver's license. (R. at 34.)

Vocational expert, Michael Wiseman, testified at Herron's hearing. (R. at 46-52.) Wiseman stated that Herron's past work as a dishwasher was classified as unskilled, medium work.[4] (R. at 48.) The ALJ asked Wiseman to consider a hypothetical individual of Herron's age, education and work history, who could occasionally lift and carry items weighing 40 pounds and frequently lift and carry items weighing 20 pounds, stand, walk or sit for six hours in an eight-hour workday with normal breaks, who was limited to simple, routine and repetitive tasks and who would be required only to make occasional decisions and occasional changes in the work setting. (R. at 48.) Wiseman testified that such an individual could perform Herron's past work as a dishwasher. (R. at 48.) Wiseman also identified jobs that existed in significant numbers at the unskilled medium level

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2013).

that such an individual could perform, including jobs as a janitor, a hand packer and a dining room attendant.[5] (R. at 49.)

Wiseman was asked to assume the same individual, but who would be reduced to standing or walking two hours in an eight-hour workday. (R. at 50.) Wiseman stated that such an individual would not be able to perform the jobs previously identified. (R. at 50.) He stated that such an individual could perform the jobs of an arcade attendant, a parking lot attendant and a plastics products assembler. (R. at 50.) Wiseman was asked to consider the same individual, but who could bilaterally reach above his head to 90 degrees for only one-third of the day, who could bend at the waist or kneel one-third of the day, who should avoid exposure to unprotected heights and who should not crouch or crawl. (R. at 51.) Wiseman stated that such an individual could perform the jobs previously identified. (R. at 51-52.) When asked if the individual had no useful ability to deal with work stresses, to maintain attention and concentration or to demonstrate reliability, Wiseman stated that there would be no jobs available that such an individual could perform. (R. at 52.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; H. Morgan Griffith, Congressman;[6] Joseph Leizer, Ph.D., a state

_____

[5] While the hypothetical posed to the vocational expert was slightly less than the definition for medium work, the vocational expert stated that he took that into consideration with the jobs he identified. (R. at 49.) He stated that about 90 percent of the jobs he identified did not require the individual to lift and carry the full 50 pounds. (R. at 49.) He stated that the jobs he identified usually had a lifting requirement of up to 25 to 30 pounds. (R. at 49.)

[6] Apparently, Herron's neighbors contacted Congressman Griffith's office in January 2012 with concerns about Herron's situation. (R. at 211.) The neighbors reported that Herron had always been a hard worker but "slow." (R. at 211.) They stated that, at the time of the call, Herron was "not all there." (R. at 211.) It was reported that Herron was living in a house without water or power, and frost-bite was a concern. (R. at 211.) Tina Osborne, a friend of Herron's, stated that she assisted Herron in completing forms because he could not read or write. (R. at

agency psychologist; Mountain View Regional Medical Center; Kathy Jo Miller, M.Ed., a licensed psychological examiner; Robert S. Spangler, Ed.D., a licensed psychologist; Norton Community Hospital; Dr. Kevin Blackwell, D.O.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Brett Compton, O.D.; and Bon Secours St. Mary's Hospital.

Herron's school records show that he obtained a full-scale IQ score of 100 when he was in the second grade. (R. at 274.) His full-scale IQ score dropped to 79 while he was in the third grade. (R. at 274.) Herron repeated the third grade and obtained a full-scale IQ score of 97. (R. at 274.) Herron also repeated the fifth grade. (R. at 273.) After repeating the fifth grade, Herron's math and reading equivalency was at the 4.2 grade level. (R. at 273.) After completing the sixth grade, Herron's math equivalency was at the seventh-grade level. (R. at 273.)

On June 27, 2004, Herron presented to the emergency room at Bon Secours St. Mary's Hospital for a laceration to the left hand and amputation to the third and fourth digits due to a lawnmower accident. (R. at 411-22.) Closure of the amputation was performed, and Herron tolerated the procedure well. (R. at 412-13.)

On September 13, 2007, Herron was admitted to Mountain View Regional Medical Center, ("Mountain View"), for complaints of fever, chills, vomiting, diarrhea and muscle and joint pains. (R. at 288-94.) Herron reported that he smoked two packs of cigarettes a day. (R. at 288.) It was noted that Herron was "vague on how much he drinks." (R. at 288.) Herron reported that when he had the money he would consume a six- or 12-pack of beer a day. (R. at 288.) Chest x-rays

213.) Congressman Griffith contacted the Social Security Administration on behalf of Herron. (R. at 210.)

showed pneumonia and COPD, elevated central venous pressures and mild congestive heart failure or fluid overload. (R. at 395-96, 403.) A CT scan of Herron's head/brain showed no acute intracranial abnormality and mild fissure consistent with atrophy. (R. at 401.) Herron was discharged on October 2, 2007, with a diagnosis of left lower lobe pneumonia with Candidiasis, resolving gradually; alcohol withdrawal syndrome, resolved; chronic alcoholism; congestive heart failure, resolved; hypertension, controlled; COPD; and severe hypokalemia and electrolyte imbalance. (R. at 291, 294.)

On May 28, 2010, Herron presented to the emergency room at Mountain View for a shoulder injury. (R. at 377-87.) X-rays of Herron's right shoulder showed acromioclavicular, ("AC"), joint separation. (R. at 385.) It was noted that Herron was able to ambulate independently and could perform all activities of daily living without assistance. (R. at 380.) On January 24, 2011, Herron again presented to the emergency room for frost bite to both feet. (R. at 367-76.) He was diagnosed with a contusion to the right foot. (R. at 369.)

On June 26, 2008, Kathy Jo Miller, M.Ed., a licensed psychological examiner, and Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Herron at the request of Disability Determination Services. (R. at 295-301.) Herron reported that he lost his driver's license as a result of a second driving under the influence charge in 2000. (R. at 295.) He admitted to being an alcoholic. (R. at 295.) Miller reported that Herron frequently needed instructions repeated and was consistently distracted. (R. at 296.) He needed frequent redirection to get back on task. (R. at 296.) Herron reported that, in the past, he had been fired from his job for drinking. (R. at 297.) No symptoms of depression or anxiety were noted. (R. at 297.) The Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), was administered, and Herron obtained a performance IQ score of 57, a verbal IQ score

of 67 and a full-scale IQ score of 60. (R. at 299.) Miller reported that these scores were considered invalid, as they were considered to be a gross underestimate of Herron's ability due to his giving up too quickly on tasks and problems with concentration. (R. at 299.)

Herron reported a history of alcohol dependence and stated that he had not consumed alcohol within the past year. (R. at 299.) He later admitted to being arrested for public drunkenness two months prior and to being hospitalized for alcohol detoxification in September 2007. (R. at 299.) Herron reported that he was depressed over losing custody of his children. (R. at 299-300.) He reported that he had never sought psychiatric treatment or counseling. (R. at 300.) Miller noted that Herron had significant problems with concentration and memory. (R. at 300.) Miller diagnosed alcohol dependence, in questionable remission, and depression, not otherwise specified, mild and untreated. (R. at 300.) Miller assessed Herron's then-current Global Assessment of Functioning, ("GAF"),[7] score at 55.[8] (R. at 300.) Miller reported that Herron's work-related abilities to understand and remember, to sustain concentration and to adapt were limited. (R. at 300-01.) Miller reported that Herron's ability for persistence and social interaction was not significantly limited. (R. at 300.)

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

On March 1, 2010,[9] Spangler completed a mental assessment indicating that Herron had a seriously limited ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 308-10.) He reported that Herron had no useful ability to deal with work stresses, to maintain attention/concentration, to understand, remember and carry out complex and detailed instructions and to demonstrate reliability. (R. at 308-09.) He reported that Herron was not capable of managing his own benefits. (R. at 310.) Spangler reported that Herron would miss about two days of work a month. (R. at 310.)

On September 14, 2010, Joseph Leizer, Ph.D., a state agency psychologist, reported that Herron had limitations in his ability to understand and remember. (R. at 98-99.) He noted that Herron's ability to remember locations and work-like procedures was not significantly limited nor was his ability to understand and remember very short and simple instructions. (R. at 98.) Leizer reported that Herron's ability to understand and remember detailed instructions was moderately limited. (R. at 98.) He noted that these limitations were due to the combination of borderline intelligence and alcohol abuse. (R. at 98.) Leizer reported that Herron's ability to carry out very short and simple instructions was not significantly limited, but that his ability to carry out detailed instructions and to maintain attention and concentration for extended periods was moderately limited. (R. at 98.) He also noted that Herron's abilities to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in

_____
[9] There is nothing in the record to indicate that Herron saw Spangler subsequent to the June 2008 consultation.

proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were not significantly limited. (R. at 98-99.) Leizer reported that Herron did not have limitations on his abilities to socially interact or to adapt. (R. at 99.)

A chest x-ray dated July 8, 2008, showed emphysema and degenerative changes in Herron's lumbar spine. (R. at 302.) On March 18, 2009, Herron presented to the emergency room at Norton Community Hospital for complaints of shortness of breath and cough. (R. at 304-06, 351-56.) He had full range of motion of all extremities with no pedal edema. (R. at 305.) Psychiatric examination was normal. (R. at 305.) Herron was diagnosed with pneumonia. (R. at 305.) On May 4, 2010, Herron was seen at the emergency room for right shoulder pain after falling from his bicycle. (R. at 341-43.) X-rays of Herron's right shoulder showed an AC separation. (R. at 335.) A CT scan of Herron's brain showed mild to moderate cerebral and cerebellar atrophy and mucosal thickening in the maxillary and ethmoid sinuses. (R. at 334.) An emergency intervention assessment was completed by the Community Services Board. (R. at 344-50.) It was noted that Herron smelled of alcohol. (R. at 345.) He reported "heavy" consumption of alcohol on a daily basis. (R. at 345.) Herron was diagnosed with depressive disorder, not otherwise specified, and alcohol dependence. (R. at 346.) His then-current GAF score was assessed at 35.[10] (R. at 346.) A chest x-ray performed on June 15, 2010, showed COPD without acute cardiopulmonary process. (R. at 324.)

---

[10] A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...." DSM-IV at 32.

On April 4, 2010, Dr. Kevin Blackwell, D.O., examined Herron at the request of Disability Determination Services. (R. at 311-15.) Herron complained of pain in his back, knees and shoulders and problems with his lungs. (R. at 312.) Dr. Blackwell reported that Herron was alert and cooperative with good mental status. (R. at 313.) Herron's breathing was not labored, and his lungs were clear to auscultation. (R. at 313-14.) His gait was symmetrical and balanced. (R. at 314.) Herron's upper and lower joints were with no effusions or obvious deformities. (R. at 314.) His upper and lower extremities were normal for size, shape, symmetry and strength, and he had good grip strength. (R. at 311, 314.) Fine motor movements and skill activities of the hands were normal, as well as reflexes. (R. at 314.) Dr. Blackwell diagnosed probable infection of the soles of Herron's feet, exertional dyspnea, probable COPD, chronic low back pain and bilateral knee and shoulder pain. (R. at 314.) Dr. Blackwell opined that Herron could sit for eight hours in an eight-hour workday, assuming position changes every hour, stand for one to two hours in an eight-hour workday, assuming a positional change every 15 to 20 minutes, operate a vehicle for one-third of the day, bend at the waist for one-third of the day, kneel for one-third of the day, perform above head reach activities to 90 degrees for one-third of the day and perform foot pedal operating for one-third of the day. (R. at 314-15.) Dr. Blackwell opined that Herron could not squat, stoop, crouch, crawl or work around unprotected heights. (R. at 314.) He found no limitations in Herron's ability for hand usage, including fine motor movements and skill activities. (R. at 315.) Dr. Blackwell opined that Herron could occasionally lift items weighing up to 40 pounds and frequently lift items weighing up to 20 pounds. (R. at 315.) No vision, communicative, hearing or environmental limitations were noted. (R. at 315.)

On April 13, 2010, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Herron at the request of Disability Determination Services.

(R. at 316-23.) Herron alleged disability due to problems with his lungs, back, vision, knees and shoulders. (R. at 316.) Herron reported that he began consuming alcohol at age 17, and in the past would drink at least a 12-pack of beer per day. (R. at 319.) When asked, Herron stated that he had his last beer "yesterday." (R. at 319.) Lanthorn reported that he could not be sure, but there was a faint odor of alcohol about Herron. (R. at 320.) Herron reported that he had never had any formal psychiatric or psychotherapeutic intervention. (R. at 319.) Herron exhibited no signs of ongoing psychotic processes or any evidence of delusional thinking. (R. at 320.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Herron obtained a full-scale IQ score of 67. (R. at 320-21.) Lanthorn reported that Herron's test results were within the ballpark of his overall level of intellectual functioning. (R. at 320.) Lanthorn reported that Herron showed no real problems with memory deficits or concentration and no difficulties sustaining his efforts on tasks. (R. at 322.) His communication skills were good, and he showed no ongoing psychotic processes or any evidence of delusional thinking. (R. at 322.) Herron's mood was euthymic, and he often laughed and joked. (R. at 322.) Lanthorn diagnosed alcohol abuse, rule out alcohol dependence, mild adjustment disorder with depressed mood, borderline intellectual functioning and personality disorder, not otherwise specified. (R. at 321-22.) Lanthorn reported that Herron had no substantial limitations that would affect his work-related abilities. (R. at 322.) Lanthorn assessed Herron's then-current GAF score at 61-65.[11] (R. at 322.)

On August 20, 2010, Dr. Brett Compton, O.D., examined Herron at the request of Disability Determination Services. (R. at 325.) Dr. Compton reported that Herron's best corrected vision was 20/20 in both eyes. (R. at 325.) He was

_____

[11] A GAF score of 61-70 indicates "some mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

diagnosed with presbyopia correctable with spectacle lenses. (R. at 325.) Dr. Compton stated that Herron had normal ocular health and that he had the ability to participate fully in the normal workforce. (R. at 325.)

*III.  Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2013).  *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§  404.1520(a), 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

In his brief, Herron argues that the ALJ's determination of his residual functional capacity is not supported by substantial evidence. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Herron also argues that the Commissioner erred by failing to find that he meets the criteria for the listing for mental retardation, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C).[12] (Plaintiff's Brief at 8-9.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975.) Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

_____

[12] Herron did not allege mental retardation as one of his disabling impairments in his Disability Report. (R. at 221.)

Herron argues that the ALJ erred by failing to find that his impairment meets the medical listing for mental retardation, found at § 12.05(C). For the following reasons, I disagree. The regulations explain that a claimant may not meet the mental retardation listing unless his "impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria…." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A (2013). The introductory paragraph states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2013).

To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C), a claimant's condition must meet two requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70; and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function. The Secretary's regulations do not define the term "significant." However, this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *See* 581 F. Supp. at 159. The regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) (2013); *see Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211 (4th Cir. 1990).

In June 2008, Herron obtained a verbal IQ score of 67, a performance IQ score of 57 and a full-scale IQ score of 60. (R. at 299.) However, Miller noted that these scores were considered a "gross underestimate" of Herron's ability. (R. at 299.) Miller noted that Herron's true intellectual function was most likely in the borderline range consistent with his word reading scores and work history. (R. at 299.) Miller diagnosed borderline intellectual functioning and opined that his ability to understand and remember was moderately limited, his ability to sustain concentration was moderately to severely limited, and his ability to adapt was limited, but Miller did not state to what degree. (R. at 300-01.)

A review of Herron's school records does not demonstrate deficits. Herron obtained a full-scale IQ score of 100 when he was in the second grade. (R. at 274.) His full-scale IQ score dropped to 79 while in the third grade, but after repeating the third grade, he obtained a full-scale IQ score of 97. (R. at 274.) After repeating the fifth grade, Herron's math and reading equivalency was at the 4.2 grade level. (R. at 273.) After completing the sixth grade, Herron's math equivalency was at the seventh-grade level. (R. at 273.) There is no indication that Herron participated in special education classes. In 2008, Herron obtained a full-scale IQ score of 60. (R. at 299.) In 2010, Herron obtained a full-scale IQ score of 67. (R. at 320-21.) Lanthorn noted that Herron's scores were lowered by the fact that Herron did not have his reading glasses. (R. at 320.) Lanthorn also noted that Herron "gave a less than desirable effort" and had a faint odor of alcohol. (R. at 320.) Lanthorn diagnosed Herron with borderline intellectual functioning. (R. at 321-22.) He opined that Herron had no substantial limitations that would affect his ability to function in the work situation. (R. at 322.)

Miller, Spangler and Lanthorn all agreed that Herron had borderline intellectual functioning and not mental retardation. Miller and Spangler opined that

Herron most likely operated within the borderline range of intellectual functioning given his work reading test scores and work history. (R. at 299.) Lanthorn explained that Herron was "currently functioning in the borderline range overall when adaptive functioning is considered." (R. at 322.) In addition, state agency psychologist Leizer reviewed the IQ test scores of record and opined that Herron did not meet or equal listing § 12.05. (R. at 82-83.)

In his opinion, the ALJ also cited other evidence showing that Herron did not have deficits in adaptive functioning consistent with mental retardation. The ALJ referenced Herron's June 2008 and April 2010 consultative examinations where he was found socially confident and comfortable, with an appropriate affect and normal range of expression. (R. at 19, 296, 319.) Herron reported that he had no difficulty getting along with others, including authority figures, and that he had never been fired or laid off from a job due to problems getting along with co-workers. (R. at 19, 244.) Based on this, I find that substantial evidence exists to support the ALJ's finding that Herron did not meet or equal the listing for §12.05(C).

Herron also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 5-7.) Based on my review of the record, I find this argument unpersuasive. The ALJ noted that he was giving Spangler's assessment little weight. (R. at 24.) He noted that Spangler issued his March 2010 mental assessment nearly two years after he last saw Herron. (R. at 24.) As noted by the ALJ, Spangler's opinion identified significantly more severe limitations than he identified in his June 2008 assessment. (R. at 24.) At the hearing, Herron's attorney confirmed that Spangler did not reevaluate Herron, and no additional objective evidence existed from which Spangler based his opinion. (R. at 54.) In addition, Spangler's opinion was inconsistent with other

medical source findings and opinions of record. For example, a preadmission screening performed in May 2010 showed that Herron's thought content, thought process and memory all were within normal limits. (R. at 345.) Leizer opined that Herron could perform simple and unskilled work. (R. at 83.) He also opined that Spangler's March 2010 opinion overestimated the severity of Herron's restrictions and limitations. (R. at 86.)

Lanthorn, who evaluated Herron one month after Spangler's March 2010 assessment, found that Herron had adequate grooming and hygiene. (R. at 319.) He also found that Herron had a euthymic mood, his affect appeared normal, and he frequently joked and laughed. (R. at 319.) Herron denied problems with irritability, memory or concentration. (R. at 320.) Lanthorn found that Herron did not have substantial work limitations. (R. at 322.) The ALJ limited Herron to simple, routine and repetitive tasks in a low-stress job. (R. at 20.)

The ALJ accepted Dr. Blackwell's opinion that Herron could occasionally lift items weighing up to 40 pounds, frequently lift items weighing up to 20 pounds, sit for eight hours in an eight-hour workday, stand/walk for one to two hours in an eight-hour workday, perform no more than occasional bending or overhead reaching, never crawl and avoid working around unprotected heights. (R. at 20, 314-15.) To the extent that the ALJ did not accept Dr. Blackwell's opinion concerning alternating positions, squatting, stooping, crouching and kneeling, he found that these limitations would not prevent Herron from performing the jobs identified by the vocational expert.

Dr. Blackwell described Herron as a well-developed and well-nourished individual in no acute distress. (R. at 313.) Herron had a normal gait and balance, and no evidence of joint effusion or deformities existed. (R. at 314.) Herron's

upper and lower extremities were of normal size, shape, symmetry and strength. (R. at 314.) His reflexes were within normal limits, and a Romberg test[13] was negative. (R. at 314.) Herron had bilateral knee pain with compression testing. (R. at 314.) He had a normal range of motion in his knees, cervical spine, thoracolumbar spine, shoulders, elbows, hips, ankles and wrists. (R. at 311.) Therefore, the ALJ found that Dr. Blackwell's objective medical findings did not support the need for positional changes or avoidance of certain postural activities.

Furthermore, the limitations that the ALJ did not accept would not prevent Herron from performing the occupations identified by the vocational expert. The vocational expert testified that the occupations of arcade attendant, parking lot attendant and plastics products assembler would permit an individual to change positions as Dr. Blackwell described. (R. at 50-51.) The vocational expert testified that the jobs are "basically a sit/stand job" and permit an individual to sit or stand at will. (R. at 51.) The vocational expert further testified that the individual could perform the above-mentioned jobs even if he could kneel for only one-third of the day and could not perform crouching or crawling. (R. at 51-52.)

Based on my review of the record, and for the above-stated reasons, I find that substantial evidence exists in the record to support the ALJ's findings as to Herron's mental and physical residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

---

[13] Romberg test is used to determine the presence of irregular muscle action or failure of muscle coordination. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 161, 1691 (27th ed. 1988).

1.   Substantial evidence exists to support the Commissioner's finding that Herron did not meet or equal the listing for §12.05(C);

2.   Substantial evidence exists to support the Commissioner's residual functional capacity finding; and

3.   Substantial evidence exists to support the Commissioner's finding that Herron was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Herron's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      March 20, 2014.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE